IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


KENNETH DORN                                                                    PLAINTIFF

           v.                        Civil No. 5:18-cv-05149

DEPUTY AARON BROOKS;
SHERIFF TIM HELDER; and
MAJOR RANDALL DENZER                                                          DEFENDANTS


**OPINION AND ORDER**

In this civil rights action filed pursuant to 42 U.S.C. § 1983, Plaintiff Kenneth Dorn

contends his constitutional rights were violated when he was incarcerated in the Washington

County Detention Center (WCDC).   Specifically, Dorn contends excessive force was used against

him on March 27, 2018.   Dorn names as Defendants Deputy Aaron Brooks, Washington County

Sheriff Tim Helder, and Major Randall Denzer.   The case is before the Court on Defendants'

Motion for Summary Judgment (ECF Nos. 40-42).   Dorn filed a response (ECF Nos. 59-61).

Defendants' Motion will be granted.

**I.   BACKGROUND**

Dorn was arrested and booked into the WCDC on May 29, 2017.   (ECF No. 42-2 at 1).

On March 1, 2018, Dorn entered a plea of guilty and was sentenced to a term of imprisonment.

*Id.* at 5.   The alleged excessive force occurred following his conviction.   Dorn was transferred to

the Arkansas Department of Correction (ADC) on March 29, 2018.   *Id.* at 11.

**A.   Dorn's Version of the Altercation**

On March 27, 2018, Dorn was involved in an altercation with Deputy Brooks and Deputy

Fennel. Dorn, who was at the time in administrative segregation in T-block, testified he and Inmate Freddy Jones were on their hour out in K-block. (ECF No. 42-10 at 47 & 53). Dorn testified he made a twenty-minute phone call and just shortly after that the guard opened the flap and told them their hour was up. *Id.* at 47. Dorn disagreed and said he was going to press the intercom and alert the sergeant to make sure their hour was up. *Id.* at 47. Dorn testified he pressed the button two or three times, but no one answered it. *Id.* at 52. The intercom is located right next to the door to the block. *Id.*

If their hour was not up, Dorn stated he wanted to request his time at a later date. (ECF No. 42-10 at 47). Dorn testified that when he pressed the intercom button, Deputy Brooks and Deputy Fennel entered K-block and Deputy Brooks started yelling at him to get his stuff and that they "don't got time for this." *Id.* at 48. After Deputy Brooks told Dorn his time was up, Dorn conceded that he yelled at the officers and probably used profanities. *Id.* at 54-55.

In response, Dorn claims Deputy Brooks and Deputy Fennel each grabbed one of Dorn's arms right above the elbow. (ECF No. 42-10 at 48). Dorn testified he did not threaten Deputy Brooks but did tell him he was a "stupid ass." *Id.* at 55. Dorn stated that Deputy Brooks responded: "chill the f--- out." *Id.* Dorn testified he communicated to Deputy Brooks that "he wasn't going to order [me] around." *Id.* at 60. Dorn indicated he talks with his hands and so was moving them but not "like I was going to fight" Deputy Brooks. *Id.*

Dorn testified he "snatched away" from Deputy Brooks and said: "Look, . . . I'll press the intercom. I am going to do the right thing." (ECF No. 42-10 at 49). At that time, Dorn indicated both deputies grabbed him, and Deputy Brooks threw him to the ground. *Id.* Dorn testified he resisted getting handcuffed, refused to comply with orders, and kept kicking his legs.

*Id.* at 62, 77, 81. Dorn testified he never "threw a punch at Deputy Brooks." *Id.* at 78. According to Dorn, Deputy Brooks then hit him on the head two times. *Id.* at 62.

Dorn testified that he continued to resist and at some point rolled onto his back and then Deputy Brooks again hit him on the head twice. (ECF No. 42-10 at 63). Dorn testified that he covered the side of his head and that is when all the other deputies arrived. *Id.* One of the officers pulled his taser out and told Dorn to turn over. *Id.* At this point, Dorn complied, was handcuffed, and was put in a restraint chair. *Id.* Dorn was advised he was being charged with second degree battery for having hit Deputy Brooks in the face twice. *Id.* Dorn denied this saying he had not touched Deputy Brooks. *Id.* Dorn argues that if Deputy Brooks felt threatened, he should have had the other officers assist him, used pepper spray, or used his taser. In short, Dorn believes Deputy Brooks should have done anything other than striking Dorn in the side of the head. *Id.* at 65. Dorn testified that as a result of the use of force, he had "three knots on [his] head." *Id.* at 84. Dorn denies being seen by medical but indicates he did not need medical treatment. *Id.* at 84-88. The knots went away after a week or two. *Id.* at 87.

According to Dorn, Deputy Brooks had always been "combative" towards him and every conversation has been "negative." (ECF NO. 42-10 at 48). Dorn believes Deputy Brooks has a problem with everyone that Dorn was related to. *Id.* at 58-59. In fact, the day before the altercation at issue in this case, Dorn testified he and Deputy Brooks "got into it over a blanket." *Id.* at 56. Deputy Brooks was doing blanket and towel call. *Id.* Dorn wanted to switch his blanket but had just been given a towel and did not need a new one. *Id.* According to Dorn, Deputy Brooks started demanding the towel and was yelling and cussing Dorn. *Id.* Dorn told Deputy Brooks to "shut the f—up" and walked away. *Id.* Deputy Brooks grabbed Dorn, tried to

3

cuff him, and slammed him against the wall. *Id.* at 57. Dorn was moved to administrative

segregation. *Id.*

### B. Deputy Brooks' Version of the Altercation

Deputy Brooks submitted the following use of force incident report:

at approximately 4:17 p.m., Deputy Fennel #483, Deputy Montano #529 and I were instructed to put the detainees back from their hour out who were located in K-Block. The detainees were Dorn, Kenneth . . . and Detainee Jones . . . .

     When Fennel and I approached the door, I heard Detainee Dorn yelling profanities. When I lifted the flap Dorn stated, "if you come in my f------ block I'll beat your ass, you better not come in here." Deputy Fennel and I then entered K-Block to instruct Dorn and Jones to gather their belongings because their time was up. At this time Dorn continued arguing that I wasn't going to order him around. While this was happening, Dorn continued to make aggressive motions, putting his hands up, pulling up his shirt and making verbal threats. Fennel and I instructed Dorn at least 5 times demanding that he gather his belongings. Dorn ignored all instructions.

     After arguing with Dorn for a moment, Fennel and I decided to physically restrain him by his arms. When we grabbed Dorn, he immediately began to resist so we took him to the ground. While on the ground Dorn still ignored commands and continued acting aggressive. During this Dorn was kicking at Deputy Montano and swung at my face and missed, at this point I escalated my use of force to attempt to gain control of the situation. I struck Dorn in the face twice, after this Dorn stopped and held his head.

     When I tried to get off Dorn he was holding my left leg between his legs, when I broke my leg free and went back near Dorn, to handcuff him he reached up and struck me on the right side of my face. At this time I continued my use of force and struck Dorn again still attempting to restrain him. After I struck Dorn he stopped fighting but still ignored verbal commands and would not turn over. I then place[d] my knee on the front of his shoulder to immobilize him until other officers arrived. Once Deputy Thurman #503 arrived I got off of Dorn while Thurman placed him in handcuffs. I then gathered my belongings and was not involved with placing Dorn or Jones in the restraint chair.

(ECF No. 42-5 at 1).

In Deputy Fennel's report, he indicated Dorn's anger appeared to be mainly directed at

4

Deputy Brooks. (ECF No. 42-5 at 2). Deputy Fennel also reported that Dorn threw multiple closed fist punches at Deputy Brooks' face. *Id.* While the deputies were still attempting to secure Dorn, Deputy Fennel stated that "Detainee Jones ran up to the altercation and attempted to pull Deputies off of Detainee Dorn, I wrapped my arms around Detainee Jones and pushed him away from the altercation." *Id.* Both detainees were examined by medical and no injuries were observed. *Id.* Reports were also filed by various other officers who responded to the call for assistance due to a fight in K-block. *Id.* at 2-8.

### C. The Video of the Altercation

The Court has been supplied video of the altercation. (ECF No. 42-6 at 1)(place card holder for the DVD that was conventionally filed). There are two video clips. *Id.* The first clip (Clip A) is taken from a camera pointed into the cell block from the vantage of the door—looking toward the rear of the cell block. *Id.* The second clip (Clip B) is taken from a camera pointed at the door to the cell block from the vantage of the rear of the cell block—looking toward the front of the cell block. *Id.* The videos do not include audio.

The video shows the door flap being opened and Dorn approaching the door and apparently arguing with WCDC staff. The video does not depict Dorn attempting to use the intercom as he claimed. Dorn's behavior appears agitated, consistent with the testimony that he was upset about having been told his hour out was over. The video shows Deputies Brooks and Fennel entering the cell block, followed by Deputy Montano. Dorn's attention is directed primarily at Deputy Brooks. Dorn throws up his hands and arms, thrusting his head forward, pulling at his clothes, and in general appears to be highly agitated. After a brief exchange, Deputies Brooks and Fennel each grab one of Dorn's arms and attempt to bring him to the wall. Dorn resists, and the deputies

5

then attempt to take Dorn to the floor.   The video depicts some struggle, and then the officers get

Dorn to the floor.   However, Dorn continues to struggle, moving his arms and legs, twisting his

body, and turning over, and the officers are unable to restrain Dorn.

Deputy Brooks, who is at this point straddling Dorn, strikes him in the side of the head or

face twice.   The video then shows the other inmate in the room, Jones, move toward the altercation

to assist Dorn, and Deputy Fennel intercepts Jones and attempts to move him away.   At this time,

the video depicts Dorn swiftly strike Deputy Brooks.   Deputy Brooks then strikes Dorn two more

times.   More deputies arrive and Dorn is finally restrained and handcuffed.   Dorn is then taken

out of the cell block.

### D.  After the Altercation

On April 30, 2018, Dorn was charged with second degree battery for striking Deputy

Brooks.   (ECF No. 42-2 at 8, 11).   An order of nolle prosequi was entered on August 10, 2018.

(ECF No. 50 at 20-21).

Dorn was transferred to the ADC in the early morning hours on March 29th.   Dorn

testified he was unable to file a grievance before he left the WCDC.   (ECF No. 42-10 at 93).

Dorn was returned to the WCDC in April or May of 2018 for approximately three weeks, and in

July of 2018 for about two months.   (ECF No. 42-10 at 17-18).   When he came back to the

WCDC in April or May, Dorn testified that he did not file a grievance because he knew you only

had a certain amount of time to grieve an incident and that "[y]ou can't just wait two months and

then file a grievance on two months ago.   It doesn't work like that."   *Id.*

Dorn maintains Deputy Brooks failed to follow the WCDC use of force policies.   (ECF

No. 42-10 at 98).   With respect to Sheriff Helder, Dorn testified the Sheriff allowed the excessive

force to happen without any repercussions for Deputy Brooks. *Id.* at 100. Dorn believes the Sheriff should be held liable "for what happens with his deputies, the people that he employs." *Id.* at 101. Dorn indicated he was told by WCDC staff that Sheriff Helder and Major Denzer are copied with all incident reports. *Id.* at 102. Dorn never spoke to the Sheriff regarding the incident. *Id.* at 103. Dorn believes Major Denzer is also liable because Major Denzer is a supervisory officer who allowed the incident to happen and Deputy Brooks was not disciplined in any way. *Id.* at 105. Dorn believes the supervisors should have had and did have knowledge that Deputy Brooks was prone to using excessive force prior to the incident occurring. *Id.* at 106-07. Dorn testified that he had been told that Deputy Brooks was having "constant problems" with other inmates, and that Dorn was not the only one suing him. *Id.* at 107. Dorn could identify only one incident in which Deputy Brooks had used force against an inmate prior to using force against Dorn, and no evidence that the force used was excessive. *Id.* at 109-10 Neither Sheriff Helder nor Major Denzer were at the WCDC when the incident between Deputy Brooks and Dorn occurred. *Id.* at 100.

### E. WCDC Policies

The WCDC policies provide that physical force should only be used when an "attack by a detainee(s) on a facility employee(s), visitor(s), or other detainee(s) is actually occurring, is clearly imminent, or when other lesser means have failed to achieve a legitimate and necessary objective." (ECF No. 42-7 at 8). Officers are authorized to use only the amount of physical force necessary to maintain or regain control of a detainee. *Id.* "[O]fficers are authorized to use less lethal force techniques and issued equipment for resolution of incidents as follows: To protect themselves or another from physical harm; To restrain or subdue a resistant individual; To bring an unlawful

situation safely and effectively under control."   (ECF No. 42-8 at 1).

In the event an incident involving the use of force occurs, all involved personnel are to make "an immediate written report of all details to their immediate supervisor who will forward the report in accordance with the department's established administrative policies."   (ECF No. 42-7 at 1).   Any officer who willfully mistreats an inmate is subject to discipline and/or termination.   (ECF No. 42-1 at 5).   Deputy Brooks has not been disciplined for the use of excessive force in the WCDC.   *Id.* at 2.

Detainees of the WCDC have access to an electronic kiosk on which to enter their requests or grievances.  (ECF No. 42-1 at 3).   According to the WCDC grievance policy, a grievance "shall state fully the time, date, and names of the detention officers and/or staff members involved and pertinent details of the incident, including the names of any witnesses."   (ECF No. 42-7 at 6). The Detainee Handbook advises detainees that they are allowed to file a grievance if they feel that they have been subjected to abuse or abridgment of their civil rights while detainees.   (ECF No. 42-9 at 19).   All grievances are to be submitted on the kiosk.   *Id.*   The handbook indicates grievances are to be submitted within eight (8) hours from the time the event complained of occurred.   *Id.*   All grievances are reviewed by the jail administrator or designee.   *Id.*   If the inmate feels his grievance was improperly handled, the inmate may appeal to the Sergeant or Lieutenant.   *Id.*

## II.   LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.   DISCUSSION

Defendants maintain they are entitled to summary judgment because:   (1) Dorn failed to exhaust his administrative remedies; (2) there is no proof of personal involvement on the part of Sheriff Helder and Major Denzer; (3) Deputy Brooks' use of force was in a good faith effort to restore order and discipline; (4)   Defendants are entitled to qualified immunity in their individual capacities; and (5) there is no basis for official capacity/county liability.

**A.  Exhaustion**

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). "[T]o properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (internal quotation marks and citation omitted).

The "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id*. A prisoner's remedies are exhausted "when [the] inmate pursues the prison grievance process to its final stage and receives an adverse decision on the merits." *Hammett v. Cofield*, 681 F.3d 945, 947 (8th Cir. 2012). Non-exhaustion is an affirmative defense. *Jones*, 549 U.S. at 211-12.

The Eighth Circuit Court of Appeals has recognized two exceptions to the PLRA's exhaustion requirement: (1) when officials have prevented prisoners from utilizing the grievance procedures; or, (2) when the officials themselves fail to comply with the grievance procedures. *See Gibson v. Weber,* 431 F.3d 339, 341 (8th Cir. 2005) (explaining a prisoner is only required to exhaust those administrative remedies that are "available" and any remedies that prison officials prevent a prisoner from utilizing are not considered available).

Dorn failed to submit a grievance following the altercation. The WCDC grievance procedures as set forth in the WCDC policy D11.5, require a grievance to be submitted "promptly" after an incident has occurred. (ECF No. 42-7 at 6). The detainee handbook is more specific and provides that the grievance must be filed "within eight hours from the time the event complained of occurred." (ECF No. 42-9 at 19). Dorn argues he could not submit a grievance following the

10

incident. On March 27th, after the incident, Dorn was placed in the restraint chair. When released, he was taken directly to administrative segregation where inmates are on lock down for twenty-three hours of the day. The only time the kiosk can be accessed is during the hour out. On March 28th, Dorn testified he was taken to court and when he returned to the WCDC, the block he was assigned to had already had their hour out. In the early morning hours of March 29th, Dorn was transported to the ADC. Dorn maintains, and the record supports, that he did not have access to a kiosk at any time prior to his transport to the ADC. Dorn is required to comply with the procedural rules of the WCDC to exhaust his remedies. *Jones*, 549 U.S. at 218 (requiring prisoners to comply with the procedural rules of the incarcerating facility). However, he could not have done so prior to his ADC transport. *Porter v. Sturm*, 781 F.3d 448, 451 (8th Cir. 2015)("Available remedies are capable of use for the accomplishment of a purpose immediately utilizable and accessible"). Because he was prevented from submitting a grievance, Dorn is excused from the exhaustion requirement. *Lyon v. Vande Krol*, 305 F.3d 806, 808 (8th Cir. 2002)(inmates not held to the exhaustion requirement when prison officials prevented them from exhausting their administrative remedies). The Court also agrees that no purpose would be served by requiring Dorn to have file an untimely grievance on a subsequent incarceration.

Defendants are not entitled to summary judgment on the issue of exhaustion.

### B. Individual Capacity Claims Against Sheriff Helder and Major Denzer

"Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed. Section 1983 does not sanction tort by association." *Heartland Acad. Cmty. Church v. Waddle*, 595 F.3d 798, 805-06 (8th Cir. 2010)(quotation marks and citation omitted). "To establish personal liability of the supervisory defendants, [Dorn] must

11

allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (internal quotations and citation omitted). General responsibility for supervising a detention center is insufficient to establish personal involvement. *Reynolds v. Dormire*, 636 F.3d 976, 981 (8th Cir. 2011). "An officer may be held liable only for his or her own use of excessive force." *Smith v. City of Minneapolis*, 754 F.3d 541, 547-48 (8th Cir. 2014)(quotation marks and citation omitted).

Neither Sheriff Helder nor Major Denzer were at the facility when the altercation took place. Dorn has no evidence that either one was aware of the altercation when it occurred but relies on a belief that incident reports were passed up the chain of command after the fact. While Dorn alleges there have been other complaints about Deputy Brooks' behavior that should have put Sheriff Helder and Major Denzer on notice that Brooks was likely to resort to an unconstitutional use force, Dorn has not provided evidence of any prior incident. There is no basis on which to hold either Sheriff Helder or Major Denzer personally liable for the conduct of Deputy Brooks.

Sheriff Helder and Major Denzer are entitled to summary judgment on the individual capacity claims asserted against them.

### C. Individual Capacity Excessive Force Claim Against Deputy Brooks

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. In *Whitley v. Albers*, 474 U.S. 312 (1986), the Supreme Court stated that:

> After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment.

. . .

Where a prison security measure is undertaken to resolve a disturbance, such as occurred in this case, that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Id.* at 319-20. When determining whether a triable issue exists on the basis of use of force against a convicted person, he Court considers such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, the threat to the safety of the staff and inmates, and any attempt to temper the severity of the response. *Id.* at 321. "The word 'sadistically' [in the *Whitley* opinion] is not surplusage, 'maliciously' and 'sadistically' have different meanings, and the two together establish a higher level of intent than would either alone." *Howard v. Barnett*, 21 F.3d 868, 872 (8th Cir. 1994)(citation omitted).

The Supreme Court held that "the extent of any resulting injury, while material to the question of damages and informative as to the likely degree of force applied is not in and of itself a threshold requirement for proving this type of Eighth Amendment claim." *Williams v. Jackson*, 600 F.3d 1007, 1012 (8th Cir. 2010)(*citing Wilkins v. Gaddy*, 590 U.S. 34 (2010)). "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley*, 475 U.S. at 319.

Video exists of the incident giving rise to Dorn's claims. Although there is no audio, the video is consistent with Defendant's claims that Dorn was refusing to follow orders, inconsistent with Dorn's claims that he was simply trying to intercom to communicate with the sergeant, and

shows that once Deputies Brooks and Fennel attempted to restrain him, Dorn began physically

resisting the officers. Deputy Montano then began to assist. With three officers attempting to

restrain him on the floor, Dorn continued to successfully resist their efforts by remaining in

constant motion by twisting and turning his body. Even after Deputy Brooks twice struck Dorn

in the side of the face or head, Dorn continued resisting. When Inmate Jones entered the fray,

Dorn used this opportunity to strike out at Deputy Brooks. While it is not entirely clear from the

video whether Dorn successfully made physical contact with Deputy Brooks, Deputy Brooks then

struck Dorn two more times.

Dorn suffered only minor physical injuries from the altercation and testified he did not

need any medical attention. There is no evidence in the record that demonstrates a genuine

dispute of material fact as to whether Deputy Brooks acted maliciously and sadistically for the

purpose of causing harm to Dorn. Rather, the video conclusively supports that the alleged

unconstitutional force was used only in response to Dorn's active physical resistance of the

officers.

Deputy Brooks is entitled to summary judgment on the individual capacity claims against

him.

### D. Official Capacity Claims Against Washington County

Official capacity § 1983 claims against a defendant are "functionally equivalent to a suit

against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254,

1257 (8th Cir. 2010). Plaintiff's official capacity claims against Defendants are treated as claims

against Washington County. *See Murray v. Lene*, 595 F.3d 868, 873 (8th Cir. 2010). "[I]t is well

established that a municipality [or county] cannot be held liable on a *respondeat superior* theory,

that is, solely because it employs a tortfeasor." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). To establish liability on the part of Washington County under section 1983, Dorn "must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citation omitted).

Dorn does not allege the existence of any policy, practice, or custom of Washington County that contributed to the alleged violation of Plaintiff's constitutional rights, and one cannot reasonably be inferred from the evidence on the record. Accordingly, Plaintiff' s official capacity claims against Defendants fail as a matter of law.

## IV.  CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (ECF No. 40) is **GRANTED** and this case **DISMISSED WITH PREJUDICE.** A judgment will be entered this same date.

IT IS SO ORDERED this 17th day of January 2020.

/s/ P.K. Holmes III

P. K. HOLMES, III
U.S. DISTRICT JUDGE